I. Julian Isley v. Commissioner.
Isley v. Commissioner
Docket No. 858-62.
United States Tax Court
T.C. Memo 1964-90; 1964 Tax Ct. Memo LEXIS 245; 23 T.C.M. (CCH) 535; T.C.M. (RIA) 64090; April 8, 1964
*245 Consideration received by taxpayer under a contract for sale of his accounting business was consideration for the sale of a capital asset, taxable as capital gain. Robert O. Rogers, Harvey Bldg., W. Palm Beach, Fla., for the petitioner. Jones E. Davis, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1957 in the amount of $2,515.68. The sole issue remaining for decision is whether $6,000 received by petitioner pursuant to an agreement for the sale of his accounting practice is taxable as ordinary income or capital gain. All other issues raised by the pleadings have been settled by agreement between the parties. Findings of Fact Some of the facts were stipulated and are so found. I. Julian Isley, herein referred to as petitioner, is an individual residing in North Palm Beach, Fla., who filed his income tax return for 1957 with the district director of internal revenue, Syracuse, N. Y. Petitioner is a certified public accountant and for about 37 years prior to 1957 engaged in the public accounting business as a sole proprietorship *246 in Cazenovia, N. Y. Petitioner's accounting practice for the most part consisted of audit and cost work, installation of systems, and other accounting services for a limited number of clients which, just prior to 1952, numbered approximately 20 to 25. Generally, petitioner charged each of these clients an annual fee which was payable monthly after the work was performed. During the 10- or 12-year period just prior to 1957, petitioner received in excess of $20,000 of gross income per year from his accounting practice; for the first 8 months in 1957, he had billed his clients for the average monthly amount of $1,868.33. During the early part of 1952, petitioner found it extremely difficult to carry on the regular routine of his accounting practice due to his poor health, and thereupon decided to employ an additional certified public accountant for the purpose of regularly servicing his clients. Accordingly, on July 8, 1952, petitioner entered into a contract of employment with Julius J. Kruth, hereinafter referred to as Kruth, for this purpose. The agreement provided in part as follows: Now, THEREFORE, in consideration of mutual and reciprocal agreements hereinafter contained, *247 the parties hereto do hereby agree as follows: That the party of the first part [petitioner] agrees to employ the party of the second part [Kruth] and the party of the second part agrees to become employed and work for the party of the first part in the general capacity of an accountant in the city of Syracuse or any other place or places as he may be assigned by the first party during his employment, which shall begin August 1, 1952 and shall terminate December 31, 1957. The party of the second part on his part hereby agrees as follows: 1. That he will devote his time attention and best interest during the period required for the performance of the duties and rendition of such services as he may be assigned by the first party. 2. That he will not during the period of his employment, or any time thereafter, use to his personal advantage, or disclose to any individual, firm or corporation, any information concerning the business or affairs of I. Julian Isley or any of his clients, that he may have acquired during his employment hereunder. 3. That he will not while in the employ of the party of the first part and two years after termination of this employment contract solicit *248 or cause to be solicited, or accept any accounting, tax, auditing or any work pertaining to the accountancy profession from any of the clients of the party of the first part, directly or indirectly, for the benefit of others, nor shall he be instrumental in obtaining such clients or such others either directly or indirectly, for the benefit of others. * * *
The party of the first part on his part hereby agrees as follows: * * *
2. That he will pay the second party the percent of gross receipts collected from the accounting service he has performed as follows: A. 24 1/2% of the gross receipts derived from the service of accounting for the period from August 1, 1952 and up to December 31, 1953. B. 26% for the calendar year 1954. C. 27% for the calendar year 1955. D. 27 1/2% for the calendar years 1956 and 1957. * * *
That the party of the first part shall, with the aid of his own personnel and the aid of the party of the second part and his personnel and facilities, continue in charge of and supervise the work relating to clients as to which the party of the first part shall have been the procuring cause. All work performed for the clients of the party of *249 the first part by the party of the second part or his staff, shall be submitted for review and criticism to the party of the first part. * * *
It is mutually agreed, that for the consideration of the second party's performance, under the terms of this agreement, at only a nominal percentage of the annual gross receipts from first party's accounting practice, that at the expiration of this agreement, namely December 31, 1957, the accounting practice of I. Julian Isley, hereinbefore referred to, shall become the sole property of Julius J. Kruth, the party of the second part. * * *
It is mutually agreed between the parties hereto that this contract may be terminated by either party for any cause whatsoever upon given ninety days (90) notice in writing to the respective party. Between 1952 and 1957, Kruth, pursuant to the employment contract, operated the accounting office in Cazenovia, N. Y., at his own expense while petitioner was residing in Florida. During the spring, fall, and winter months of those years, Kruth personally serviced each client, prepared work papers and periodic financial statements and then submitted them to petitioner for review. This work performed *250 by Kruth was done according to procedures dictated by petitioner, and before any final reports were submitted to the clients, they were submitted to petitioner for his examination. During the summer months of each of these years, petitioner returned to Cazenovia and assumed some of the regular duties of his accounting business. He accompanied Kruth on personal visits to clients' places of business, prepared work papers and statements, and in addition reviewed most of Kruth's work. At all times, it was understood that Kruth was an employee of the firm and that petitioner assumed sole responsibility as between himself and his clients for the final work product. Petitioner billed his clients direct and received payment directly from them, remitting to Kruth his percentage of the gross receipts. His health having improved to some extent, in the summer of 1957 petitioner formally notified Kruth that he desired an extension of the employment contract beyond the December 31, 1957, termination date and more specifically through December 31, 1960. Kruth refused petitioner's request for an extension and, cognizant of the provision in the employment contract relating to its termination, made *251 a counteroffer to petitioner, the substance of which was that Kruth would, on December 31, 1957, become owner of the firm as provided in the original employment contract, employ petitioner in a consulting capacity for an additional 2-year period, and pay him an amount equal to 27 1/2 percent of the gross receipts from the firm as employee's salary. Had petitioner accepted this offer, it could be anticipated that he would have received between $5,500 and $6,000 during each of the years 1958 and 1959, as well as the amount he was entitled to receive for the remainder of 1957 under the then-existing employment contract. Petitioner, however, refused Kruth's counterproposal and on August 13, 1957, formally notified him in writing, and the more important clients, that he had clected to terminate the contract of employment with Kruth pursuant to his rights thereunder, and accordingly, that Kruth was to do no more work for petitioner's clients, that he was to turn over to petitioner all working papers and other work products relating to petitioner's clients, and that he would receive his pro rata share of gross receipts under the contract for the following 90 days. Kruth, after ascertaining *252 his rights under the employment contract from his attorney, decided that under the circumstances, it would be more advantageous for him to attempt to reach an amicable agreement with petitioner for acquisition of the business, rather than litigate, since petitioner again realized that his poor health would prevent him from assuming the entire operation of the business. Kruth thereupon notified petitioner that he desired to purchase the accounting business for the amount of $6,000. Petitioner accepted this offer and on August 23, 1957, they executed a contract of sale pursuant to which petitioner sold his entire interest in the accounting practice to Kruth for $6,000. This agreement provided in part as follows: 1. The party of the first part [petitioner] for and in consideration of the sum of $6,000.00, the receipt whereof is hereby acknowledged by the party of the first part, hereby sells, conveys, grants and assigns to the party of the second part, all of the right, title and interest which the party of the first part has or owns in that portion of his accounting, tax and auditing practice and accounting work arising out of the affairs, business, and activities of every name, *253 kind and description of the * * * [various] individuals and corporations, hereinafter called "the clients", title including files pertaining to these clients in first party's possession shall pass upon execution of this agreement August 23, 1957. * * *
2. Party of the first part promises and agrees that he will not at any time use to his personal advantage or disclose to anyone any information concerning the affairs, business and activities of said clients. 3. The party of the first part further promises and agrees that he will at no time solicit or cause to be solicited or accept for himself or for the benefit of others, either directly or indirectly from the said clients, any accounting, tax, auditing or any work pertaining to the accountancy profession. * * *
5. The parties hereby release each other from any and all obligations and any and all claims which either party may have by reason of an agreement entered into by the parties on July 8, 1952. First party will make no claim against anyone on the list of accounts hereinbefore referred to arising out of any accounting services or contracts and certifies that he has no claim for any services or contract heretofore *254 performed by first party for any of said accounts and first party does release said accounts from any claims. Due to an oversight, the parties found it necessary to execute at the same time a supplemental agreement, which allowed petitioner to collect an additional amount of $1,133.33 from one of the regular clients for work which had been done but which would not be paid for until about September 1, 1957. During the process of winding up his affairs relating to the accounting practice, petitioner notified each client that he had sold the accounting practice to Kruth and that the latter party, as owner, would be in full charge of all of its operations and would assume full responsibility therefor. In his income tax return for 1957, petitioner reported $7,000 as capital gain relaized from the sale of his business, being the original contract price of $6,000 plus $1,000 of the supplemental amount. Petitioner failed to report the $133.33 balance of the supplemental amount. Respondent in his notice of deficiency determined that the $7,000 should have been reported as ordinary income. The parties have, by supplemental stipulation, recognized that the $1,000 supplemental amount had *255 been included in the gross income from the business reported by petitioner and have reduced the amount in issue from $7,000, as reported on petitioner's return, to $6,000, and have settled any issue relating to the $133.33 by such stipulation. Opinion Petitioner contends that the $6,000 he received from Kruth is taxable as capital gain from the sale of a capital asset, his accounting practice and the goodwill attached thereto, relying on ; ; ; and . The main thrust of respondent's argument is that the agreement of sale dated August 23, 1957, was not actually a sale of the accounting practice but was in fact an agreement permitting petitioner to receive in a lump sum the balance of the income he would have been entitled to receive during the remainder of the year 1957 under the employment contract of 1952, and is therefore to be taxed as ordinary income. Respondent also argues, alternatively, that if the transaction was a sale at least a part of the consideration should be attributed *256 to the covenant not to compete and taxable as ordinary income. Respondent's principal argument is based primarily on the fact that the $6,000 petitioner received under the contract of sale was approximately the amount petitioner could have reasonably anticipated receiving from the business under the existing arrangement for the balance of the year 1957, after which time, under the employment contract, Kruth would have been entitled to the accounting practice, and that equity was on the side of Kruth. But this argument ignores certain provisions in the employment contract and also ignores what was actually done. Both petitioner and Kruth, who was called as a witness by respondent, testified that in July 1957 petitioner attempted to extend the employment contract for 3 years and that Kruth made a counteroffer for a 2-year extension but on entirely different terms. This being unacceptable to petitioner, he formally notified Kruth in writing of termination of the contract, which he would appear to have had a right to do under the terms of the contract. We are not concerned with the equities of the situation or what redress Kruth may have had at law, because the fact is, and Kruth so *257 testified, that he deemed it advisable to attempt to buy petitioner's practice amicably rather than litigate, and that is what he did. He, at least conditionally, accepted the fact of termination of the employment contract and offered to buy the business. When his offer was accepted a new contract was entered into and the old contract was terminated. The fact that Kruth may have used petitioner's anticipated future income under the employment contract as a measure of the amount he would offer to pay petitioner for the business is of little moment because there is not even any evidence that this was discussed by the parties in their negotiations. The agreement of August 23, 1957, was by its terms undoubtedly a contract of sale of petitioner's accounting business. Petitioner sold and assigned to Kruth all of his right, title, and interest in his accounting practice arising out of the affairs and business activities of his clients who were identified by name, he agreed not to solicit or do any further accounting work for them, and he was released of all obligations and responsibilities with respect to the practice from that date on - and both parties were released from all obligations *258 under the employment contract. There is nothing in the terms of the contract of sale to indicate that the consideration paid by Kruth was in lieu of future income that might come due to petitioner and there is no evidence that there was any unpaid income that Kruth would receive for services rendered in the past under the employment contract. We will not presume to rewrite the contract of the parties or read into it something that is not there in the absence of convincing evidence that the written contract does not represent the true agreement of the parties. . The evidence here all points to the fact that the contract of sale was negotiated at arm's length and was intended to and does mean just what it says. It also indicates that the parties performed under it in accordance with its terms. We conclude that the $6,000 received by petitioner was consideration for the sale of his accounting business and was neither a prepayment of future income, as respondent seems to argue, nor consideration for the assignment of future income. The only question remaining then is whether any part of the sales price should be attributed to a covenant *259 not to compete, which would make it taxable as ordinary income. See . It is now well settled that vendible goodwill can exist in a professional business and that the sale of a professional business, including its goodwill, constitutes the sale of a capital asset. Rodney B. Horton, Richard S. Wyler, Malcolm J. Watson, and Merle P. Brooks, all supra. However, if a part of the consideration paid for the business is for a covenant not to compete, that part is taxable as ordinary income. . The question in these cases is to determine whether the covenant may be severed from the transfer of goodwill and was separately dealt for by the parties. The rule, as stated in , is: If such an agreement can be segregated, not so much for purposes of valuation as in order to be assured that a separate item has actually been dealt with, the agreement is ordinary income and not the sale of a capital asset. . But where it accompanies the transfer of good will in the sale of a going business and it is apparent that *260 the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which he has acquired, the covenant is regarded as nonseverable and as being in effect a contributing element to the assets transferred. ; . Here the testimony of both the seller and the buyer was to the effect that the principal assets transferred were the clients' accounts, including the files and work papers pertaining to those clients. It would follow as a part of any such transaction that the seller would not solicit or do accounting work for those clients - otherwise the accounts acquired would be of little benefit to the buyer who, in this case, was a relative newcomer to those clients. These accounts, with the probability that the clients would resort to the old place, see , constituted the goodwill of petitioner's business. Petitioner's agreement not to solicit or undertake to do accounting business for them was a part and parcel of the sale of the accounts, and was nonseverable from the sale of the goodwill. Furthermore, *261 it seems clear from the evidence that the motivating force behind the sale of the business was to relieve petitioner of all responsibility for these accounts so he could return to Florida, and that petitioner had no intention or inclination to compete with Kruth for this or any other business. The contract itself placed no separate price on petitioner's agreement not to do accounting work for these clients in the future and there is no evidence to support an argument that this was bargained for separately. All the evidence supports the conclusion that this agreement was but an integral part of the entire agreement for the sale of the business. We conclude that the entire $6,000 received by petitioner from Kruth under the contract of sale was consideration for the sale of a capital asset, taxable as capital gain. Because of concessions on other issues, Decision will be entered under Rule 50.